RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JERRY DUNCAN, et al.

*Plaintiffs*,

CHARLES T. EVANS; DAVID MCBRIDE; RONALD E. FARLEY; LARRY J. SIMPSON; ROBERT B. BONDS; STEVE HINCH,

*Plaintiffs-Appellants*,

*v.*

LEONARD J. MUZYN, et al.,

*Defendants*,

TENNESSEE VALLEY AUTHORITY RETIREMENT SYSTEM; TENNESSEE VALLEY AUTHORITY,

*Defendants-Appellees*.

No. 15-6019

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cv-00217—Aleta Arthur Trauger, District Judge.

Argued: June 14, 2016

Decided and Filed: August 12, 2016

Before: SILER, ROGERS, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. James S. Christie, Jr., BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, Alabama, for Appellee Tennessee Valley Authority Retirement System. Edward C. Meade, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee Tennessee Valley Authority. **ON BRIEF:** Michael J. Wall, James G. Stranch, III, R. Jan Jennings, Joe P. Leniski, Jr., Michael G. Stewart, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. James S. Christie, Jr., BRADLEY ARANT

1

BOULT CUMMINGS LLP, Birmingham, Alabama, Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee Tennessee Valley Authority Retirement System. Edward C. Meade, Edwin W. Small, Frances Regina Koho, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee Tennessee Valley Authority.

_____

**OPINION**

_____

ROGERS, Circuit Judge. Public and private pension plans alike often include cost-of-living adjustments to base benefits so that plan participants can receive the real value of those benefits. One way to calculate such adjustments is to make them dependent on yearly changes in the consumer price index. For more than four decades, the Tennessee Valley Authority Retirement System (TVARS) did just that. Employees of the Tennessee Valley Authority (TVA), who participate in TVARS-managed retirement plans, thus received cost-of-living adjustments on top of their investment returns, pension benefits, and supplemental benefits. That changed in 2009. In that year, with the retirement system's financial health in jeopardy, the TVARS board amended the rules that govern the system to cap or eliminate cost-of-living adjustments for the years 2010–2013, increase the eligibility age for cost-of-living adjustments, and lower the interest rate on a savings fund. The complaint in this case soon followed, with the plaintiffs arguing—among other things—that cost-of-living adjustments are vested benefits and that the TVARS board violated one of its own rules by reducing such a benefit. The plaintiffs also raised a Takings Clause claim.

None of the claims survived summary judgment. According to the district court, the plaintiffs did not have a private right of action to enforce the board's compliance with the TVARS rules, and the Takings claim failed on the merits. Despite having adopted the 2009 amendments, the TVARS now professes that it did so in error, agreeing with the plaintiffs that courts may review the board's 2009 actions and that cost-of-living adjustments are vested. The TVA disagrees on the vesting issue.

Summary judgment in favor of the TVA and the TVARS was proper on the Takings Clause claim. Because cost-of-living adjustments are not vested, the agencies were also entitled

to summary judgment on the merits of the claim that the board violated TVARS rules by reducing vested benefits. As for the remaining claims alleging violations of the TVARS rules, those claims are judicially reviewable in the context of this case. Remand is therefore required for the district court to address those claims in the first instance.

In 1933, Congress created the TVA, a federal agency that is organized and operated as a corporation. *See* Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831 *et seq.* Several years later, the TVA established the TVARS for the purpose of managing the retirement plans of TVA employees, who become members of the retirement system upon accepting employment. The TVA created the TVARS by promulgating Rules and Regulations (the Rules), which established how the retirement system would be administered and what benefits would be payable to plan participants. As the system is a governmental pension plan, it is not governed by the Employee Retirement Income Security Act (ERISA). *See* 29 U.S.C. §§ 1002(32), 1003(b)(1). The TVA's statutory authority to create the retirement system has long been beyond question. *See Tenn. Valley Auth. v. Kinzer*, 142 F.2d 833, 836–37 (6th Cir. 1944).

According to the Rules, the TVARS is governed by a seven-member board. Rule 3.1, Rules and Regulations of the TVA Retirement System, *available at* http://www.tvars.com/pdf/tvars_rules_regs.pdf (last visited June 22, 2016). Three of the board's members are elected by TVA employees, three others are appointed by the TVA, and the last board member is selected by a majority vote of the other six. *Id.* The relationship between the TVARS and the TVA is unique. Although the TVARS was created by the TVA, it is operated for the benefit of TVA employees. The TVARS board was accordingly given broad authority to manage the retirement system, including decision-making responsibility on investment portfolios, the "interest rate or rates to be used in all actuarial and other calculations," and what benefits are payable and to whom. Rule 3.7, 4.1, 4.5. The board was also entrusted with the power to amend the Rules, from "time to time [and] as may be necessary to carry out the provisions of the Retirement System." Rule 3.6. Notwithstanding this extensive power, the independence of the TVARS from the TVA remains cabined in significant ways. Almost all of the retirement system's funding comes from the TVA, and the board must submit to the TVA annual reports on the system's financial condition. Rule 3.5, 9.B.1, 9.B.5. The board's

amendment prerogative is circumscribed by the Rules, too. For one thing, the TVA wields a veto power: amendments proposed by the board become effective only if the TVA does not exercise its veto within thirty days. Rule 13. In addition, Rule 13 contains a so-called anti-cutback provision, prohibiting amendments that "reduce the then accrued benefits of the existing members or beneficiaries which are nonforfeitable or [are] covered by accumulated reserves held therefor." This appeal hinges on the anti-cutback provision, as the plaintiffs' chief argument is that the TVARS violated Rule 13 by reducing cost-of-living adjustments (COLAs) for the years 2010–2013.

The plaintiffs in this case are among the 36,000 current and former TVA employees who participate in the retirement system. Two-thirds of the participants are retired. Under the Rules, the retirement income of those participants comes from four sources. First, eligible beneficiaries receive a monthly pension benefit in an amount linked to their average compensation and years of service.[1] Rule 6.A.2, 7.C. Second, beneficiaries receive a monthly supplemental benefit that is related to the costs of medical insurance. Rule 18.A–B. Third, beneficiaries have the option of contributing to a fixed-rate fund or variable-rate fund, both of which are managed by the TVARS. Rule 9.A, 19.A. The interest rate for the fixed fund was lowered by the 2009 rule amendments that are at issue in this case. Fourth, beneficiaries may receive COLAs, payments that increase pension and supplemental benefits based on yearly changes in the consumer price index (CPI). Excepting the years at issue in this case, COLAs are triggered as follows:

> The board shall increase (subject, however, to the provisions of section 11) that portion of the monthly benefit payable to each retiree, or beneficiary of a deceased member or retiree, which is derived from TVA's contributions to the System . . . whenever the 12-month average of the Consumer Price Index (CPI) for any year after 1966 exceeds by as much as one percent (1%) the CPI average for the preceding year.

Rule 6.I, 7.L; *see also* Rule 18.C.3. By tying COLAs to the CPI, the Rules preserve the purchasing power of pension and supplemental benefits.

---

[1]Two types of benefit plans are now in place. One of those plans—the "original benefit structure"—was closed to new entrants in December 1995, and is covered by Rule 6. Provisions concerning the more recent plan, the "cash balance benefit structure," are in Rule 7. The differences in these plans are not relevant to this appeal.

COLAs have not always been a part of the retirement system. That feature was implemented in 1967, when the board amended the Rules to apply COLAs to benefits based on TVA contributions. Later amendments contained language explicitly committing the TVA to funding COLAs: "[a] further 'cost-of-living contribution'" to the TVARS, in addition to two other types of contributions, "shall be made [by the TVA] to provide the funds to pay for increases in monthly benefits." Rule 9.B.1. The Rules make clear that COLAs are an important feature of the retirement system. According to one provision, "[t]he total amount payable each year by TVA to the Retirement System shall be not less than the sum of the normal contribution rate and the accrued liability contribution rate . . . plus cost-of-living contributions." Rule 9.B.5. As for the amount of a COLA, one provision gives the board some discretion to depart from the CPI formula: "the board may, in its discretion and with the approval of TVA, apply for any year a maximum different from [a 5% cap]." Rule 6.I, 7.L.

Another round of amendments followed soon after, in 1974. Prior to that date, none of the benefits provided to beneficiaries was vested, a term that the parties agree is synonymous with nonforfeitable. That meant that the Rules did not prevent the board from reducing a participant's future benefits. After the enactment of ERISA, however, the board decided to guarantee certain categories of benefits instead of offering the plan-termination insurance that ERISA required for private pensions. Although ERISA does not apply to the retirement system, the board took this action in recognition of the congressional intention that employers should follow through with their financial commitments to employees. Rule 13 was therefore amended to include the anti-cutback provision, which protects accrued benefits that are vested. Rule 11.B.1, the only rule defining what benefits are vested, indicates that "[r]ights to benefits based on a member's own contributions shall be nonforfeitable." Also vested, according to Rule 11.B.1, are certain "accrued benefits from creditable service based on TVA's contributions," and cash balance benefits distributed after five years of cash balance service.

This case, like many others, has its genesis in the recession of the late 2000s. During that time, the liabilities of the TVARS grew to exceed its assets by $3 billion. In June 2009, the TVARS made its annual contribution request to the TVA for the following year, asking for $300 million to keep the system afloat. The TVA countered with a proposal to give the TVARS $1

billion, a lump sum that would be conditioned on a TVARS promise not to request additional funds until 2014. In the TVA's counterproposal, the agency also suggested that the TVARS reduce its liabilities by lowering COLAs for the years 2010–2013, increasing the COLA-eligibility age for TVA employees, and reducing the annual interest rate on the fixed-rate fund. On August 16, 2009, a special TVARS board meeting was called for the following day. In this litigation, one board member has asserted that she was not made aware of the purpose of the meeting until several hours beforehand. Other evidence suggests, however, that the question of whether COLAs are vested had been the subject of some discussion before that meeting, as board chairman Frank Alford had asked in July 2009 for an actuary's opinion on that question. By a 4-3 vote, the board approved amendments to the Rules that were consistent with the TVA's counterproposal. The thirty-day period passed without a TVA veto.

The changes to the Rules increased the COLA-eligibility age from 55 to 60 for participants retiring in 2010 or after, and decreased the interest rate on the fixed fund from 7.25% to 6%. Rule 6.I, 7.L, 18.C; Appendix Rule 17. The amendments also eliminated COLAs for 2010 and 2012, and capped them at 3% and 2.5% for 2011 and 2013. Rule 6.I, 7.L, 18.C. The amendments had their intended effect. Deposition testimony indicates that the changes reduced the retirement system's potential liabilities by over $200 million.

The named plaintiffs in this case—which is styled as a class action—took issue with the amendments, filing suit against the board's directors in federal court. An amended complaint named only the TVA and the TVARS as defendants. In that complaint, the plaintiffs asserted that the board's actions violated several provisions of the Rules. Among other things, the plaintiffs alleged that: Rule 13 prohibited the TVARS from capping COLAs, from increasing the COLA-eligibility age, and from decreasing the interest rate on the fixed fund; the TVA was required to make annual contributions to the TVARS; the board did not give plan participants proper notice for the amendments; and the board violated provisions related to an account called the "Excess COLA Account." Although the complaint was not entirely clear on the proper vehicle for asserting the Rules-violation arguments, it asserted those arguments primarily under fiduciary-duty and declaratory-judgment counts. In addition to those claims, the plaintiffs charged the board with violating the procedural and substantive protections of the Administrative

Procedure Act (APA). Finally, the plaintiffs asserted a Takings Clause claim based on the 2009 amendments, maintaining that the board's actions deprived plan participants of protected property interests.

After discovery, the TVA moved for summary judgment, arguing that the board's actions were valid under the Rules. The TVA conceded that "[t]he arbitrary and capricious standard of review applies here regardless of whether TVARS is an agency within the meaning of the APA," and did not argue that the plaintiffs' Rules-violation arguments were not reviewable. The plaintiffs also filed a partial motion for summary judgment on the question of liability for each claim. The TVARS filed a single "response" to both motions. Although the TVARS agreed with the TVA that the APA does not apply to the TVARS and that there was no merit to the plaintiffs' arguments concerning notice, the interest rate, and the Excess COLA Account, the TVARS asked the district court to grant the plaintiffs summary judgment on the issue of whether COLAs are vested. According to the minutes of a 2015 board meeting, the directors at that time—in another 4-3 decision—voted to approve the TVARS summary-judgment response, which confessed that the 2009 amendments were in error. At summary judgment, then, neither agency had contested the reviewability of the plaintiffs' arguments that the board had violated Rule 13 and other provisions.

The district court nonetheless held that those claims—labeled by the plaintiffs as "nonstatutory claims"—were not judicially reviewable. In reaching that result, the court first concluded that neither the Rules nor the Tennessee Valley Authority Act created a "private right of action" to enforce the Rules. The district court so held notwithstanding our indication in an unpublished opinion that plaintiffs may challenge the board's decisions using causes of action that predate the APA. *See Beaman v. Ret. Sys. of Tenn. Valley Auth.*, 928 F.2d 1132, at *2 (6th Cir. 1991) (table opinion). According to the district court, the Rules-violation arguments could not be asserted under the APA either, because the TVARS did not fall within the APA's definition of "agency." That conclusion meant that the court could not review any arguments that the board had violated the Rules. As for the Takings Clause claim, the district court held that the claim was without merit because the Rules did not create a property right in a particular amount of COLAs. The district court also rejected an estoppel claim, a claim that the plaintiffs

do not press on appeal.   The district court reasoned in conclusion that the purported non-reviewability of the board's actions was attributable to the unique, quasi-governmental nature of the retirement system.

On appeal, the plaintiffs argue that their Rules-violation arguments are reviewable, that the board violated Rule 13 by reducing vested COLAs, and that they were deprived of COLAs in violation of the Takings Clause.   The TVARS agrees as to the reviewability of its own actions.   As for the TVA, the agency argues primarily that the 2009 amendments did not violate the Takings Clause.   This conclusion, the TVA maintains, moots every other issue.

Because none of the parties disputed the judicial reviewability of the Rules-violation arguments in the district court, and the issue is not a matter of court jurisdiction, we can safely assume that those claims are reviewable under one rubric or another, without resolving the esoteric issue of what precise cause of action obtains.   Even without the parties' concessions, the claims are reviewable, given the strong presumption of reviewability and the fact that the APA did not displace common-law review.   Even though the Rules-violation claims are reviewable, affirmance is nonetheless required on the merits of the plaintiffs' claim that future COLAs are vested benefits.   That claim, which was briefed on appeal, is foreclosed by the plain language of the Rules.   Nor does it help the plaintiffs that the TVARS now agrees with the plaintiffs concerning vesting, as there are strong reasons for not applying the deference described in *Auer v. Robbins*, 519 U.S. 452 (1997), to that agency's litigation position.   Lastly, our holding regarding vesting requires the conclusion that the agencies were entitled to summary judgment on the Takings Clause claim, as well.   In short, a forfeitable benefit cannot be a constitutionally protected property right for Takings Clause purposes.

## I.

### A.

As a preliminary matter, the APA does not provide a basis for judicial reviewability in this case.   Chapter 7 of the APA governs judicial review of agency action, empowering courts to set aside final agency action.   5 U.S.C. §§ 704, 705.   Yet that statute's procedural and substantive

provisions regarding agency action extend only to statutorily-defined agencies. *See id.* § 701(b)(1). The TVARS does not meet that criterion.

Section 701 excludes "agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them." *Id.* § 701(b)(1)(E). The TVARS board fits squarely within the first part of this exception, because it is composed of representatives of the parties to this case. Although the APA does not define the word "representative," that word naturally includes members of a governmental body who are appointed or elected by management and employee groups, as are six of the directors on the board. Three board members are elected by TVARS participants, *see* Rule 3.2, and so those members are most fairly characterized as representatives of the participants. So too with the three directors appointed by the TVA: those members are best understood as representatives of TVA management. Allowing plan participants and the TVA to place three members on the board allows the interests of the financier and the payee to be represented in the board's decision-making processes. As a practical matter, that is what happened here. When voting on the summary-judgment brief in this litigation, the board split 4-3, with the three TVA-appointed directors siding with the agency and the three participant-elected directors voting that COLAs are vested. *See* TVARS, *TVA Retirement System Board of Directors*, http://www.tvars.com/aboutus.htm (last visited June 24, 2016). Board members are thus representatives of the groups to whom they owe their position.

Moreover, the phrase at the end of § 701(b)(1)(E), "to the disputes determined by them," applies on its face to the TVARS board. First, the board necessarily resolves disputes between itself and plan participants in light of its "exclusive responsibility" under Rule 3.7 "for determining . . . what benefits are payable by the Retirement System and to whom they shall be paid." Rule 3.7. Second, when the board makes decisions on what benefits are payable by the retirement system, it also impliedly resolves disputes between plan participants and the funder of the retirement system, the TVA. In this case, for instance, by interpreting the Rules as vesting COLAs, the TVARS has attempted to exercise just that kind of dispute-resolution power.

Because the TVARS is not an "agency" for APA purposes, the APA does not provide for judicial reviewability of its action.

**B.**

But even though the APA does not apply, the decisions of the TVARS are judicially reviewable. Both the TVARS and the TVA have conceded that the plaintiffs' Rules-violation arguments are reviewable. In any event, agency action was presumptively judicially reviewable before the APA was enacted.

The TVA's decision not to argue reviewability in the district court is significant. "[W]hile subject-matter jurisdiction can never be waived or forfeited, we usually require timely and reasoned presentation of non-jurisdictional issues to avoid forfeiture." *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1006 (6th Cir. 2009) (citations omitted). Reviewability is such a non-jurisdictional issue. Because this case involves the interpretation of regulations promulgated by a federal agency, *see Kinzer*, 142 F.2d at 837–38, the district court had jurisdiction to hear this case under 28 U.S.C. § 1331. In contrast to subject-matter jurisdiction, the question of reviewability relates to whether a cause of action exists and whether review has been foreclosed by a statute or other type of law. The parties are free to concede reviewability if they so choose, and both agencies have done so here. Although the TVA did not make an explicit concession in the district court that the case was reviewable, the TVA also did not make any argument in the other direction. The TVA argued below that "Plaintiffs' argument [for a Rules violation] necessarily fails because . . . the TVARS Board's judgment that the Amendments did not reduce benefits in violation of [Rule 13's] anti-cutback provision was not arbitrary and capricious." That is an argument concerning the merits, not about whether judicial review exists. Nor has the TVA made a serious effort to contest reviewability on appeal.[2]

Even if the TVA or the TVARS had taken a different litigation position regarding reviewability in the district court, an independent analysis of the issue yields the same result. In

---

[2]The TVA's brief focuses almost entirely on issues other than reviewability. At the end of the brief, the TVA appears to advert to two arguments that could be construed as arguments against reviewability. Neither one has any force. First, the TVA argues that the plaintiffs waived any claims for "nonstatutory" review by failing to label the claims as nonstatutory claims in the district court. The nomenclature of the claims, however, is not dispositive of the waiver issue, particularly where, as here, a claim can be defined in various ways. Second, the TVA argues that the plaintiffs should have used an administrative appeals procedure that was added to the Rules in 2012. But the complaint in this case was filed in 2010, and the TVA cannot defeat judicial review by pointing to an amendment that was adopted after litigation in this case had already begun.

this case, we need not decide whether reviewability of agency action outside of the APA should be described as § 1331 review, nonstatutory review, or federal common-law review. We likewise need not determine whether the relevant cause of action lies in certiorari or mandamus, or by means of equitable relief. Whatever the appropriate label for describing the basis for reviewability, the plaintiffs' claims are reviewable, and the scope of review and extent of our power are the same, at least in the context of this case.

Reviewability is the norm. Courts strongly presume the reviewability of agency action, and nothing rebuts that principle here. "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). This presumption is a strong one, *see Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015), and an "agency bears a 'heavy burden'" in proving that Congress intended to preclude all judicial review. *Id.* (citation omitted). In 5 U.S.C. § 701(a), the APA codified the two primary ways by which agency conduct may be made unreviewable. *See also Abbott Labs.*, 387 U.S. at 140; 33 Charles A. Wright & Charles H. Koch, Jr., *Federal Practice and Procedure* § 8390 (1st ed. 2006). These limits pre-existed the APA. *See Abbott Labs.*, 387 U.S. at 140; U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 94 (1947). Neither one applies here. First, no statute precludes judicial review of the actions of the TVARS board. The Tennessee Valley Authority Act does not mention the TVARS. *See* 16 U.S.C. §§ 831–831ee. Nor does the statute preclude review of the actions of the TVA or an agency created by the TVA, and a statute's silence does not indicate that Congress intended to make agency action unreviewable, *see Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.*, 658 F.2d 1182, 1190 n.4 (7th Cir. 1981). Second, no argument has been made that the decisions of the TVARS are committed to agency discretion by law. Agency action has been held to be committed to agency discretion generally when there is "no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citation omitted), and specifically in areas not traditionally amenable to judicial review, such as prosecutorial discretion or the allocation of government resources, *see Heckler v. Chaney*, 470 U.S. 821, 834 (1985). This case is nothing like cases in which agency action has been found to be committed to agency discretion.

Reviewability in this case is supported by our reasoning in *Beaman*, another case involving claims against the TVARS. In *Beaman*, the plaintiff challenged a decision by the board to award the equity in a savings plan to the decedent's estate. 928 F.2d 1132, at *1–2. Although the parties disputed the applicability of the APA, we declined to rule on that issue, reasoning that "the district court applied the correct standard of review"—the arbitrary and capricious standard—"inasmuch as the standard of review would be the same under the Act or federal common law." *Id.* at *2. We thus recognized that regardless of whether the APA applied, the plaintiff's claim was reviewable. Nothing in the opinion hinted that review of the board's decisions might be foreclosed by statute or any other reason.

As *Beaman* suggested, the fact that the APA's remedies do not apply with respect to the TVARS does not change the picture. Far from displacing judicial review that occurs outside of the APA regime—including review of agency action under the general federal-question statute— the APA expressly acknowledges that this review survives. Section 703 provides that "[t]he form of proceeding for judicial review . . . in the absence or inadequacy" of special statutory review is "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." 5 U.S.C. § 703. The actions mentioned in that section are representative of the actions that courts entertained before the APA's enactment in 1946. *See* Louis L. Jaffe, *Judicial Control of Administrative Action* 164–96 (1965). Section 703 thus acknowledges that where a statute does not establish a right of action, a case is nonetheless reviewable under any applicable legal vehicle that predates the APA.

In an analogous case, the Seventh Circuit has explained the interaction between the common law and the APA:

> The United States contends that a congressional intent to preclude review can be inferred from the fact that Congress exempted the Postal Service from all federal law dealing with public or federal contracts, as well as the Administrative Procedure Act. The Administrative Procedure Act has been widely interpreted as being merely declaratory of the common law of reviewability and standing existing at the time of the statute's enactment in 1948. *See, e.g., Arnold Tours, Inc. v. Camp*, 408 F.2d 1147, 1161 (1st Cir. 1969), *vacated*, 397 U.S. 315 (1970); *Kansas City Power & Light Co. v. McKay*, 225 F.2d 924, 931–32 (D.C. Cir.), *cert. denied*, 350 U.S. 884 (1955). *Contra, e.g., Scanwell Labs, Inc. v. Schaeffer*,

> 424 F.2d 859, 872 (D.C. Cir. 1970). *See generally*, 6 Jaffe, *Judicial Control of Administrative Action*, at 372, 528–30 (1965) (hereinafter cited as "Jaffe, at ......"). As such, the Administrative Procedure Act embodies the basic common law presumption of judicial review. *Abbott Labs, Inc.*, 387 U.S. at 140, citing *Shields v. Utah Idaho Central RR*, 305 U.S. 177 (1938); *Stark v. Wickard*, 321 U.S. 288, (1944); *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); Jaffe, at 372; H. Saferstein, supra n.4, at 374. It can be reasonably assumed, therefore, that an agency's exemption from the provisions of the Administrative Procedure Act does not negate the applicability of common law review principles that preexisted and operate apart from the subsequent codification.

*Peoples Gas*, 658 F.2d at 1191. In that case, judicial review thus existed as to the plaintiffs' claim that the Postal Service had not complied with its own regulations, even though the Service is exempt from the APA. *Id.* at 1191–92. Other courts have followed a similar approach with respect to other APA-exempted entities. *See, e.g., Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 697 (9th Cir. 1991). The House Report accompanying the APA supports this reasoning. Section 703, according to the report, "is an express statutory recognition and adoption of the so-called common-law actions as being appropriate and authorized means of judicial review, operative whenever special statutory forms of judicial review are either lacking or insufficient." H.R. Rep. No. 79-1980, at 42 (1946).

*Alexander v. Sandoval*, 532 U.S. 275 (2001), does not require a different conclusion on reviewability. That decision did not overturn all pre-APA bases for challenging agency conduct, but instead concerned a plaintiff's ability to enforce a federal regulation against a state actor who was subject to the regulation. In that case, Martha Sandoval sued the director of the Alabama Department of Public Safety to enjoin a practice of administering state driver's license examinations only in English. *Id.* at 278–79. Sandoval argued that this policy violated a Department of Justice regulation forbidding funding recipients from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin." *Id.* at 278 (quoting 28 C.F.R. § 42.104(b)(2)). The issue before the Court was "whether there is a private cause of action to enforce the regulation." *Id.* at 279. In answering that question in the negative, the Court reasoned that "private rights of action to enforce federal law must be created by Congress" and that courts must accordingly analyze the text and structure of a statute to determine whether Congress

intended to create a private remedy. *Id.* at 286–88. In the statute at issue there, Congress had not done so. *Id.* at 293.

There is a major difference between a plaintiff attempting to obtain a remedy against a person subject to federal regulations, and a plaintiff attempting to hold an agency accountable for alleged violations of its own rules. *Sandoval* spoke to the former situation—alleged misconduct by a regulated person. But this case involves the latter situation—review of agency action. As the Court's 2015 decision in *Mach Mining* made clear, *Sandoval* did not overturn the presumption of reviewability that applies in the context of judicial review of agency action. *See Mach Mining*, 135 S. Ct. at 1651.

Nor does our 1944 decision in *Kinzer* say otherwise concerning the reviewability of the board's actions. In that case, we held that the Rules were authorized by the Tennessee Valley Authority Act and that they have the force of law. *Kinzer*, 142 F.2d at 836–38. In reaching that conclusion, we reasoned that the TVA "is free from a state's regulation or control and subject to suit only as permitted by the federal statute creating it." *Id.* at 837. That sentence has no bearing on this case. The sentence indicates only that Congress must waive sovereign immunity for the TVA to be subject to suit, not that the presumption of reviewability does not apply to the actions of that agency or the TVARS.

In sum, because extant causes of action survived the enactment of the APA and because courts strongly presume judicial review of agency action, summary judgment was not appropriate on the basis of reviewability. We need not resolve, however, the essentially academic question of what particular cause of action is appropriate for the residual category of non-APA agencies.

## II.

On the merits of the Rules-violation arguments, the plaintiffs in their opening brief addressed the issue of whether COLAs are vested. As noted, Rule 13 provides that "[n]o amendment to these Rules and Regulations shall be adopted which will reduce the then accrued benefits of the existing members or beneficiaries which are nonforfeitable or covered by

accumulated reserves held therefor."**3**  Because COLAs are not vested benefits, the board did not violate that provision by reducing or eliminating COLAs for the years 2010–2013.  The agencies were therefore entitled to summary judgment with respect to the claim that COLAs are vested benefits.

The plain language of the Rules controls the analysis.  *See Mitchell v. Comm'r,* 775 F.3d 1243, 1249 (10th Cir. 2015).  Most significantly, one provision that is located in two separate COLA paragraphs indicates that the amount of a COLA is completely within the board's discretion.  According to that provision, when the board calculates COLAs, "[t]he rate of increase shall be the percent increase in the CPI over the preceding [year]; provided, however, that the increase for any year shall not exceed five percent (5%) except that the board may, in its discretion and with the approval of TVA, apply for any year a maximum different from that specified above."  Rule 6.I, 7.L.  This provision authorizes the board to vary from the CPI and reduce a COLA as long as the board does so with the TVA's approval.  Although it is true that the quoted language says that "the increase for any year shall not *exceed* five percent"—language that in isolation might suggest that the provision grants only the authority to exceed a 5% cap— the discretion-granting clause uses the words "different from."  Those words indicate that the board has discretion not just to go above the 5% cap with TVA approval, but also to reduce the COLA rate.

Other sections confirm this interpretation of Rules 6.I and 7.L, proving that the discretion that those provisions mention includes the discretion to reduce future COLAs.  For one thing, the Rules do not explicitly state that COLAs are vested benefits.  Vested benefits are defined only in Rule 11.B, which is entitled "Vested (Nonforfeitable) Benefits and Segregation of Funds."  (The COLA-funding provisions in Rules 6.I and 7.L expressly incorporate Rule 11, stating that the board shall provide COLAs "subject, however, to the provisions of section 11.")  The first

---

**3**One might ask how a legal document can coherently limit a provision for its own amendment when the limit itself might be amendable.  Yet legal provisions often do so.  For instance, Article V of the Constitution prohibits an amendment that would deprive a state of its equal voting power in the Senate. U.S. Const. art. V.  We need not resolve the conundrum of whether the provision here is coherent, as the parties have not argued the lawfulness of Rule 13.  We accordingly assume that Rule 13 validly prohibits amendments that reduce vested benefits, even though conceivably Rule 13 could itself be amended to permit such a vested-benefit-reducing amendment.

paragraph of Rule 11.B.1 indicates that member contributions, pension benefits, and supplemental benefits are vested. The rule provides in relevant part:

> Rights to benefits based on a member's own contributions shall be nonforfeitable at all times. A nonforfeitable right to accrued benefits from creditable service based on TVA's contributions shall arise [upon the occurrence of one of the listed events]. A nonforfeitable right to cash balance account benefits based on TVA's contributions shall arise upon completion of 5 years of cash balance service.

In contrast to benefits based on a member's creditable service—a category that includes pension and supplemental benefits—and benefits based on member contributions, COLAs are not mentioned in Rule 11.B.1, but rather in Rule 11.B.2, which explains what happens if the TVA discontinues or reduces its contributions to the retirement system. This is significant. COLAs are not included in the same paragraph as the three types of benefits that indisputably are vested, and COLAs likely would have been included in that paragraph if they were vested, as the "Notice of Amendments" that accompanied the 1974 amendments to the Rules indicated that "[v]ested benefits are defined in section 11B1." Nor are COLAs calculated in the same way as the nonforfeitable benefits based on TVA contributions that Rule 11.B.1 describes. Unlike those benefits, COLAs are related not just to a member's years of service, but also to the CPI. What is more, Rule 11.B.2 distinguishes between COLAs and nonforfeitable benefits by stating that *both types* of payments have priority over other benefits in the event that the TVA reduces its contributions to the retirement system. These distinctions suggest that COLAs and nonforfeitable benefits are not one and the same.

Rule 11's other sections, too, treat COLAs differently from benefits that clearly are vested. Rule 11.B.4.a, for instance, provides that "[f]unds of the System sufficient to provide nonforfeitable benefits shall be segregated in the System's accounts and shall thereafter be used in the following order of priority." The rule then indicates that member contributions take top priority, that pension benefits follow, and that supplemental benefits come last. COLAs are not mentioned in subsection (a). Rather, they are addressed in subsection (e), which provides that "[t]o the fullest extent TVA finds feasible, it will also make additional contributions as required from time to time to provide cost-of-living increases pursuant to sections 6I, 7L or 18C3 for those with nonforfeitable benefits based on service prior to such discontinuance or reduction [of

TVA contributions].” Two points about this subsection deserve mention. First, the subsection qualifies the TVA's duty to fund COLAs with the language “[t]o the fullest extent TVA finds feasible.” That language strongly suggests that although the board should prioritize the payment of COLAs, it has the discretion to reduce them. Second, the subsection uses the phrase “cost-of-living increases” in the same sentence as “for those with nonforfeitable benefits,” which suggests that the two phrases refer to different benefits. That distinction is another sign that COLAs are not vested.

The Rules treat COLAs in a similar way in the section that addresses the termination of the retirement system. Rule 11.C.1 states that “[p]romptly upon the termination of the Retirement System, the board shall make such arrangements as it deems necessary or appropriate to assure payment of (1) benefits based on members' contributions; and (2) nonforfeitable benefits based on TVA contributions and, so far as it finds feasible, cost-of-living increases related thereto.” Like Rule 11.B, this provision distinguishes between COLAs and nonforfeitable benefits, and also qualifies the TVA's responsibility with regard to COLAs.[4]

In short, there is a difference between funding certain types of high-priority payments whenever possible, and writing in stone that those payments can never be reduced. COLAs undoubtedly have played and continue to play an important role in the retirement packages of plan participants. Many participants may have expected that COLAs would always be provided. But whether COLAs are vested is a different question, to which the Rules provide an answer. It is not our business to ensure a lifetime entitlement to COLAs by rewriting the Rules.

The plaintiffs offer several rejoinders to this conclusion, but none requires a different result.

---

[4]The plaintiffs cite two cases in support of the argument that Rule 11 is not relevant to the question of vesting, *see Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 377–78 (1980); *A-T-O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1018–19 (6th Cir. 1980), but neither one requires that conclusion. As an initial matter, both cases arose under ERISA—a statute that defines nonforfeitable and accrued benefits—and so have little bearing on governmental plans like the one here. Still more, the cases addressed a type of plan provision that is not at issue here—one that attempted to allow employers, upon plan termination, to disclaim liability for vested benefits to the extent that a fund's assets were not sufficient to cover the benefits. *See Nachman*, 446 U.S. at 362; *A-T-O*, 634 F.2d at 1019. This appeal involves no such provision.

First is the plaintiffs' chief objection, which concerns the issue of deference to the TVARS. This is not a case, however, where *Auer* deference is due. The plaintiffs argue that the TVARS—in its summary judgment brief—interpreted the Rules as vesting COLAs, and that the agency's position is therefore entitled to substantial deference. The TVARS' position was based on, among other things, language in the Rules stating that the board "shall increase" benefits by providing COLAs, the board's longstanding practice of awarding COLAs, and the way that the board's actuary classified COLAs in the annual report to the TVA. Although under *Auer*, 519 U.S. at 461–62, courts ordinarily defer to an agency's interpretation of its own regulations, *Auer* does not apply in the context of this case.

In the first place, the plain text of the Rules precludes deference to the TVARS. "*Auer* deference is warranted only when the language of the regulation is ambiguous. . . . To defer to [an] agency's position [where the text is clear] would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). As noted, the discretion-granting provisions in Rules 6.I and 7.L, when read in conjunction with Rule 11, allow the board to reduce COLAs. That should end the matter.

Even if the text were less clear, *Auer* would still not apply. The TVARS was designed in a way that makes it functionally subordinate to the TVA. The nature of that junior agency/senior agency relationship suggests that the views of the TVARS on the vesting of COLAs—payments that in any given year might involve high-dollar amounts—should not trump the view of the TVA. Although the TVARS has an obligation to look out for the interests of plan participants and is legally distinct from the TVA, the TVA exercises substantial control over the retirement system. For example, the TVA exercises total control over the pursestrings, as it provides all funding for the retirement system except for member contributions. Because the TVARS does not provide the funding, some of the directors on its board may be inclined to take a position that is more favorable to plan participants and less so to the TVA. The TVA also has the final say-so on every amendment by virtue of its veto power. Moreover, the entire retirement system was created by, and could be dissolved by, the TVA. These aspects of the relationship between the agencies suggest that the TVARS should not be granted greater deference than the TVA in the

matter of COLAs, a matter that has significant ramifications for the TVA's funding responsibility.

Rule 3.7 does not foreclose that conclusion. It is true that the rule endows the TVARS with some degree of interpretive authority regarding the Rules:

> The board shall have sole and exclusive responsibility for determining under these Rules and Regulations what benefits are payable by the retirement System and to whom they shall be paid; and the board's interpretation and application of the Rules and Regulations in these and all other matters pertaining to the System's operations . . . shall be final and conclusive as to all parties.

This rule, however, does not allow the TVARS to rewrite the Rules. In this case, crediting the TVARS litigation position over the TVA's would potentially allow the TVARS to require the TVA to fund benefits that neither agency originally agreed to provide. The TVARS claims a right to obtain $200 million from the TVA, and supposes that *it* should obtain deference in deciding the vesting question. That result cannot be squared with the purpose of the *Auer* doctrine.

Another reason also counsels against applying *Auer*. The TVARS has changed its position on COLAs several times in the past seven years, a fact that decreases the level of deference that a court should give to its litigation position, *see Thomas Jefferson University v. Shalala*, 512 U.S. 504, 515 (1994). Before 2009, at least some of the board members believed that COLAs were vested. At odds with that position, however, is the board's 2009 vote, which a majority of the board has since characterized as a mistake. No matter how rushed, uninformed, or ill-advised the 2009 decision, the fact remains that a majority of the board approved the reduction in COLAs. That action is not consistent with the view that COLAs are protected from reduction. In addition, some consideration was in fact given to the vesting issue before the vote, as the board's chairman consulted an actuary in July 2009 concerning whether COLAs are vested. Moreover, even though the board now maintains that the 2009 amendments were illegal, it took the board almost six years to formally disavow that decision by approving the TVARS summary-judgment brief. If one of the directors who voted to approve the brief is replaced in the near future, the agency's position could change yet again. This is not the type of case where an agency's most recent interpretation of a regulation should be given deference.

*Talk America, Inc. v. Michigan Bell Telephone Co.* is not to the contrary. 564 U.S. 50 (2011). In that case, the Court held that an agency's position may be entitled to deference even if the position is contained in an amicus brief. *Id.* at 59 (citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208–10 (2011)). The distinction between this case and *Talk America* is that the agency in that case had not recently taken action that was inconsistent with the position in the amicus brief. Also there, unlike here, the Court could say that there is no "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment." *Id.* (citation omitted). That distinction makes all the difference for *Auer* purposes.

Apart from *Auer* deference, the plaintiffs' arguments related to the language of the COLA-funding provisions do not compel the conclusion that COLAs are vested. First, the plaintiffs argue that COLAs are part and parcel of the adjusted benefits, such that COLAs necessarily vest along with the underlying base benefits. That argument cannot be squared with Rule 11, however, which expressly distinguishes between COLAs and nonforfeitable benefits. Moreover, the Rules' description of COLAs as increases or adjustments to the base benefits suggests that COLAs are not inextricably linked to those benefits. Rule 6.I, 7.L; *see also Frazier v. City of Chattanooga*, No. 1:14-CV-128, 2015 WL 9309123, at *5 (E.D. Tenn. Nov. 23, 2015). Second, the plaintiffs argue that the Rules use "mandatory, durational language" to refer to COLAs, noting that the Rules provide that "[t]he board *shall* increase . . . that portion of the monthly benefit payable" with COLAs. Rule 6.I, 7.L (emphasis added). The use of the word "shall" is not determinative. That word is best read to require the board to fund COLAs every year unless and until the board exercises its discretion to amend the Rules to change the COLA rate. In other words, decreasing COLAs requires a formal amendment, not merely a decision by the board that COLAs should be reduced.

In sum, the Rules do not vest COLAs. Although the district court did not rule on this merits question, the court's judgment may be affirmed in part on this alternative basis. On remand, the district court must address any remaining arguments for a Rules violation that are not abandoned.

**III.**

Our conclusion on the vesting issue necessarily requires dismissal of the Takings Clause claim. Although the plaintiffs' claim is framed as a Takings claim, the analysis borrows principles from the Contract Clause context. The first step in the analysis is whether the claimant has demonstrated a cognizable property interest, *see Coalition for Government Procurement v. Federal Prison Industries, Inc.*, 365 F.3d 435, 481 (6th Cir. 2004) (citation omitted), which may include an enforceable contract right, *see Parella v. Retirement Board of the Rhode Island Employees' Retirement System*, 173 F.3d 46, 59 (3d Cir. 1999). Where a public contract is alleged to have been created by statute, however, a plaintiff may prove a contractual relationship only by showing that the legislature has unmistakably intended to create a binding contract right. *See id.* at 60 (citation omitted).

That showing is absent here. Because COLAs are not vested, the TVARS did not unmistakably intend to prevent itself from reducing COLAs below the CPI rate. The 2009 amendments, then, did not deprive the plaintiffs of a protected property right.

**IV.**

The judgment of the district court is affirmed with respect to the claim that COLAs are vested benefits. The case is remanded for further proceedings consistent with this opinion.